ORDERED.

**Dated:  March 29, 2021**

Caryl E. Delano
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:                                                    Case No. 2:17-bk-01712-FMD
                                                          Chapter 11
ATIF, Inc.,

                    Debtor.
_____/

Daniel J. Stermer, as Creditor Trustee,

                    Plaintiff,

vs.                                                       Adv. Pro. No. 2:18-ap-00531-FMD

Old Republic National Title Insurance Company,
Old Republic National Title Holding Company,
Old Republic Title Companies, Inc., and
Attorneys' Title Fund Services, LLC,

                    Defendants.

_____/

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND MEMORANDUM OPINION REGARDING REASONABLY EQUIVALENT VALUE**

        THIS PROCEEDING came before the Court for trial on February 16, 17, 18, 19, 22, and 23,

2021, on Plaintiff's *Corrected Third Amended Adversary Complaint* (the "Complaint").[1] Among

_____

[1] Doc. No. 162.

other claims, Plaintiff, the Creditor Trustee in this confirmed Chapter 11 case, seeks to avoid Debtor's transfers of property to Defendant Old Republic National Title Insurance Company as actually and constructively fraudulent transfers under 11 U.S.C. § 548 and Chapter 726 of the Florida Statutes, the Florida Uniform Fraudulent Transfer Act.

With the agreement of the parties, the limited issue presented at trial was Plaintiff's claim that Debtor did not receive reasonably equivalent value in exchange for its transfers to Old Republic National Title Insurance Company.[2] As set forth below, the Court concludes that Plaintiff has not met his burden of proof on the issue of reasonably equivalent value.

I.       **FACTS**

A.       **The Parties**

1.       ATIF, Inc. ("Debtor") is a Florida corporation wholly owned by Attorney's Title Insurance Fund, a Florida Business Trust ("ATIF Trust").

2.       On March 2, 2017, Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* The Court confirmed a plan of reorganization and Plaintiff, Daniel J. Stermer, was appointed as the Creditor Trustee.

3.       Old Republic National Title Insurance Company ("OR Title") is a nationwide title insurer that is owned directly or indirectly by Old Republic National Title Holding Company ("OR Holding").[3] Together, OR Title and OR Holding are referred to herein as the "OR Defendants."

B.       **Debtor's Former Business Operations**

1.       Prior to July 1, 2009, Debtor was licensed by the Florida Office of Insurance Regulation (the "Florida OIR") as a title insurance company. The Florida OIR regulates Florida title

---

[2] Doc. No. 407, February 8, 2021 Hearing Transcript, pp. 5-8.
[3] Doc. No. 360, Joint Pre-Trial Stipulation, ¶ 2.

insurers.[4] Under Florida law, insurance companies are required to maintain a surplus of the value of its assets over the value of its policy liabilities.[5]

2.      Debtor's business operations as a title insurer included insuring title, underwriting and selling title insurance, selling title searches, managing and supporting insurance agents, and administering title insurance claims. Debtor conducted its business under the trade name "The Fund."[6]

3.      Debtor conducted its insurance business through a network of attorney-agents, who were themselves licensed as title insurance agents.[7]

4.      Debtor's headquarters were formerly located in an office building it owned in Orlando, Florida (the "Headquarters Property").[8]

5.      Debtor owned and maintained a title plant of Florida real property records (the "Title Plant"). Generally, a title plant is a compilation of property records and indexes to property records, such as deeds, mortgages, and judgments, that is used to examine the title to real property in connection with the issuance of title insurance policies.[9]

6.      Between 2005 and 2008, Debtor's market share of premiums earned by title insurance companies in the State of Florida ranged from 18.65% to 19.44%. During that same time period, OR Title's market share of premiums earned by title insurance companies in the State of Florida ranged from 6.84% to 7.71%.[10]

---

[4] Doc. No. 360, ¶ 10.
[5] Fla. Stat. § 624.408.
[6] Doc. No. 360, ¶ 5.
[7] Doc. No. 360, ¶ 5c.
[8] Doc. No. 360, ¶ 5g.
[9] Doc. No. 360, ¶¶ 5d, 5e; Doc. No. 370, Joint Supplemental Pre-Trial Stipulation, ¶ 141.
[10] Doc. No. 462-11, Plaintiff's Ex. 679.

**C.     The Joint Venture Agreement**

1.      Beginning in late 2008, Debtor experienced financial difficulties for three primary reasons:  the defalcations by certain attorney-agents in the amount of $60 million; the decline in value of its stock market investments resulting from the global financial crisis; and the reduction in its income from title insurance policies due to the effect of the global financial crisis on the Florida real estate market.[11]

2.      In early 2009, Debtor's surplus (the value of Debtor's assets over its liabilities) fell to a level near the minimum required by Florida law for a title insurer to continue to issue new policies.[12]

3.      In early 2009, Debtor's President, Charles Kovaleski, contacted OR Title's President, Rande Yeager, regarding Debtor's financial difficulties.[13]

4.      After Mr. Kovaleski's initial contact, Debtor's representatives met with representatives of OR Title at OR Title's headquarters in Minneapolis, Minnesota. Shortly thereafter, OR Holding proposed that Debtor and OR Title enter into a joint venture agreement.[14]

5.      On July 1, 2009, Debtor and OR Holding entered into a Joint Venture Agreement (the "JVA").[15]

6.      Under the JVA, Debtor and OR Holding formed a limited liability company known as Attorneys' Title Fund Services, LLC ("ATF Services") and entered into an operating agreement for ATF Services.[16] The JVA states that ATF Services was formed "for the purposes of servicing title insurance agencies."[17] Under the JVA, ATF Services provided services to OR Title in connection

---

[11] Doc. No. 360, ¶ 14.
[12] Doc. No. 360, ¶¶ 14-16; Fla. Stat. § 624.408.
[13] Doc. No. 360, ¶ 17.
[14] Doc. No. 360, ¶¶ 18-20, 27.
[15] Doc. No. 424, Defendants' Ex. 10.
[16] Doc. No. 424, Defendants' Ex. 10, pp. 29-48, Operating Agreement of Attorneys' Title Fund Services, LLC, attached as Exhibit C to the JVA.
[17] Doc. No. 424, Defendants' Ex. 10, p. 1.

with OR Title's issuance and underwriting of title insurance policies, and Debtor agreed that it would not engage in the business of title insurance underwriting or title insurance production.[18]

7.    The JVA states:

> [Debtor] covenants and agrees that it will take all reasonable action to ensure that its former agents sign an agency agreement with [OR Title], and that it will shift all business currently being written by [Debtor] to [OR Title]. All ancillary services being provided by [Debtor] shall be transferred to [a new limited liability company to be known as Attorneys' Title Fund Services, LLC].[19]

8.    Upon obtaining approval of the JVA from the Florida OIR, Debtor surrendered its license to sell title insurance. However, Debtor maintained its license to service and manage its existing title insurance policies and policy-related claims.[20]

9.    Under separate contribution agreements attached to the JVA, Debtor contributed the Title Plant and related subscription agreements to ATF Services, and OR Holding contributed $10,000,000.00 in cash and a promissory note for $700,000.00 to ATF Services.[21]

10.    Debtor and OR Holding held equal interests in ATF Services.[22]

11.    As of July 1, 2009, 544 of Debtor's 568 employees became employees of ATF Services; Debtor retained 24 employees.[23]

12.    In addition, a number of Debtor's officers and senior employees became officers and employees of ATF Services. For example, as of June 30, 2009, Ted Conner was Debtor's Associate General Counsel.[24] Effective July 1, 2009, Mr. Conner became an employee of ATF Services, as Associate General Counsel and Vice President for approximately two years, and as General Counsel

---

[18] Doc. No. 360, ¶ 54; Doc. No. 370, ¶ 140; Doc. No. 424, Defendants' Ex. 10, § 8a(ii).
[19] Doc. No. 424, Defendants' Ex. 10, § 8a(iii).
[20] Doc. No. 210-31, Consent Order dated August 27, 2009, with Florida OIR.
[21] Doc. No. 424, Defendants' Ex. 10, pp. 49-53 and 54-57, attached as Exhibits D and E to the JVA; Doc. No. 370, ¶ 142.
[22] Doc. No. 424, Defendants' Ex. 10, preamble and §§ 2, 5; Doc. No. 360, ¶ 31.
[23] Doc. No. 360, ¶¶ 38 and 39.
[24] Doc. No. 370, ¶ 122.

and Senior Vice President for approximately three years. In July 2009, Mr. Conner was appointed an Assistant Vice President of OR Title. In 2014, Mr. Conner ceased being an employee of ATF Services and became a Senior Vice President of OR Title (which position he still holds) and Deputy General Counsel and Vice President of OR Holding (which positions he still holds). As Deputy General Counsel of OR Holding, Mr. Conner is counsel to all subsidiaries of OR Holding, including ATF Services.[25]

13.　　In addition, effective July 1, 2009, the following senior management employees terminated their employment with Debtor and became employees of ATF Services:

(a)　　Debtor's Chief Financial Officer, Jimmy Jones, became ATF Services' President and Chief Executive Officer. Mr. Jones presently serves as ATF Services' Chief Executive Officer.[26]

(b)　　Debtor's general counsel, Norwood Gay, became ATF Services' Chief Legal Officer.[27]

(c)　　Debtor's Controller, Deanna Bolger, joined ATF Services effective July 1, 2009, and is currently ATF Services' Chief Financial Officer and Chief Information Officer.[28]

(d)　　Debtor's Human Resources Director, Gwen Geier, became ATF Services' Senior Vice President and Chief Financial Officer. Ms. Geier is currently ATF Services' President.[29]

(e)　　Jeannie L. Calabrese, a Debtor employee, became ATF Services' Senior Vice President and Chief Information Officer.[30]

---

[25] Doc. No. 370, ¶¶ 123-126.
[26] Doc. No. 360, ¶¶ 40-42.
[27] Doc. No. 360, ¶¶ 50-51.
[28] Doc. No. 360, ¶¶ 52-53; Doc. No. 464, February 16 Trial Transcript, p. 207.
[29] Doc. No. 360, ¶¶ 43-45.
[30] Doc. No. 360, ¶¶ 46-47.

(f)      Sharon Priest, a Debtor employee, became ATF Services' Senior Vice President and Chief Operating Officer.[31]

14.      At some point in time, Debtor's president at the time Debtor entered into the JVA, Charles Kovaleski, became a member of the Board of Directors of Old Republic International Corporation, the parent company of OR Title and OR Holdings.[32]

15.      Commencing July 1, 2009, ATF Services' principal place of business was located in the Headquarters Property, which it leased from Debtor.[33]

16.      After July 1, 2009, most of Debtor's attorney-agents signed title agency agreements with OR Title.[34]

17.      After July 1, 2009, Debtor's business was to administer its previously issued title policies and manage policy claims. This is referred to as "running off its claims tail."[35]

18.       Commencing July 1, 2009, ATF Services—not Debtor—maintained and updated the Title Plant.[36] Deanna Bolger, ATF Service's CFO since 2014, testified that the cost for ATF Services to maintain the Title Plant is approximately $10 million per year.[37]

19.      ATF Services earns fees from OR Title and third parties for searches of real property records conducted on the Title Plant in connection with their issuance of title insurance policies.[38]

20.      Debtor did not retain a copy of the Title Plant as it existed on July 1, 2009.

---

[31] Doc. No. 360, ¶¶ 48-49.
[32] Doc. No. 467, February 19 Trial Transcript, p. 202; Doc. No. 360, ¶ 9.
[33] Doc. No. 360, ¶ 58; Doc. No. 370, ¶ 134.
[34] Doc. No. 360, ¶ 32.
[35] Doc. No. 360, ¶ 36.
[36] Doc. No. 360, ¶ 37; Doc. No. 370, ¶ 143.
[37] Doc. No. 468, February 22 Trial Transcript, pp. 127-128.
[38] Doc. No. 360, ¶ 63; Doc. No. 370, ¶ 140.

21.     After Debtor and OR Holding formed ATF Services, Debtor permitted ATF Services to operate under the trade name "The Fund."[39]

22.     The evidence suggests that, after the JVA, all of Debtor's business operations related to the sale, issuance, and underwriting of title insurance policies were moved to OR Title, and all of Debtor's "ancillary" business operations were moved to ATF Services. In other words, OR Title received the revenues from the sale of title insurance policies, while the cost of maintaining the Title Plant and employing 544 of Debtor's former employees was borne by ATF Services.

23.     In 2010, the year after the 2009 JVA and the formation of ATF Services, OR Title's market share of premiums earned by title insurance companies in the State of Florida increased to 28.65%, and for the years 2011 through 2015 ranged between 29.6% and 32.5%.[40]

**D.     Debtor transfers the Marks to ATIF Trust.**

1.      In June 2011, two years after entering into the JVA, Debtor transferred all of its trade and services marks (the "Marks"), including its trade name "The Fund," to Debtor's parent, ATIF Trust.[41]

2.      Plaintiff acknowledges that Debtor was solvent in 2011.[42]

**E.     The Amended JVA**

1.      As of October 2011, ATF Services reported operating losses of approximately $30 million, and OR Holding had loaned ATF Services approximately $20 million under a loan agreement.[43]

---

[39] Doc. No. 360, ¶¶ 56-57; Doc. No. 370, ¶ 127.
[40] Doc. No. 462-11, Plaintiff's Ex. 679.
[41] Doc. No. 370, ¶ 129.
[42] Doc. No. 466, February 18 Trial Transcript, p. 99; Doc. No. 469, February 23 Trial Transcript, pp. 14-15, 46.
[43] Doc. No. 360, ¶¶ 67-68.

2.      On October 6, 2011, Debtor, OR Holding, and ATF Services entered into an Amended and Restated Joint Venture Agreement (the "Amended JVA"). The Amended JVA states that it was predicated on an understanding between the parties "with respect to the organization and financing" of ATF Services.[44]

3.      The Amended JVA included the following three critical provisions:

(a)      OR Holding agreed to continue making loans to ATF Services under the existing loan agreement;[45]

(b)      Debtor agreed that it would not engage in the business of title insurance underwriting or title insurance production;[46] and

(c)      Debtor represented and warranted that it held intellectual property rights in certain trade names and marks, including the trade name "The Fund," and granted a license to ATF Services to use the trade names and marks at no cost.[47]

4.      Section 3 of the Amended JVA provided for (a) an initial term ending on July 1, 2014, to be renewed automatically for successive one-year terms, unless Debtor or OR Holding gave notice of its election to terminate the Amended JVA at least 120 days prior to the expiration of the initial term or a renewal term; (b) for termination upon the mutual written consent of both parties; and (c) for immediate termination upon the dissolution of ATF Services pursuant to the terms of its operating agreement.[48]

5.      Section 10 the Amended JVA provided Debtor with a "Put Option," and Section 11 of the Amended JVA provided OR Holding with a "Call Option." If the requirements for Debtor's

---

[44] Doc. No. 427, Defendants' Ex. 26, p. 1; Doc. No. 360, ¶ 73.
[45] Doc. No. 427, Defendants' Ex. 26, § 4c(i).
[46] Doc. No. 427, Defendants' Ex. 26, § 8a(ii).
[47] Doc. No. 427, Defendants' Ex. 26, § 8a(iii); Doc. No. 370, ¶ 128.
[48] Doc. No. 427, Defendants' Ex. 26, § 3.

exercise of the Put Option were met, among other provisions, ATF Services was to provide Debtor with a current copy of the Title Plant and related software.[49]

6.      In the Amended JVA, Debtor and OR Holding stated their "overriding intent" that "upon the dissolution or liquidation of [ATF Services], or upon exercise of a put or call, [Debtor and OR Holding] each hereby pledges its mutual cooperation to ensure that each receives a useable and working copy of the Title Plant, including but not limited to Software, all Derivatives and irrevocable licenses thereto, but excluding computer hardware."[50]

7.      Under the Amended JVA, ATF Services was required to deliver an electronic copy of the Title Plant to Debtor and OR Title every six months,[51] and, as required, every six months ATF Services delivered a copy of the updated Title Plant to Debtor's then-president, John Simmons.[52] Mr. Simmons retained a copy of the newly and most recently updated Title Plants, referred to as the "A and B Tapes."[53]

8.      In addition, Debtor, OR Holding, and ATF Services entered an Amended and Restated Operating Agreement for ATF Services (the "Amended Operating Agreement").[54] Under the Amended Operating Agreement, Debtor held 50 Class B Units in ATF Services and OR Holding held 50 Class A Units.[55] Debtor had a "conversion option" to relinquish its Class B Units and purchase one-half of OR Holding's Class A Units prior to July 1, 2019 (the "Conversion Option"). The Conversion Option was conditioned on Debtor's first paying OR Holding 50% of all loans that OR

---

[49] Doc. No. 427, Defendants' Ex. 26, §§ 10, 11, 18a.
[50] Doc. No. 427, Defendants' Ex. 26, § 18a; Doc. No. 370, ¶ 144.
[51] Doc. No. 427, Defendants' Ex. 26, § 18e.
[52] Mr. Simmons was appointed acting president of Debtor as of March 1, 2013, and served as President of Debtor as of December 2013 through at least December 2015. Doc. No. 370, ¶ 121.
[53] Doc. No. 464, February 16 Trial Transcript, pp. 152-153.
[54] Doc. No. 427, Defendants' Ex. 26, pp. 82-103, Amended and Restated Operating Agreement of Attorneys' Title Fund Services, LLC, attached as Exhibit F to the Amended JVA.
[55] Doc. No. 427, Defendants' Ex. 26, Article VI, § 2.

Holding had made to ATF Services and 50% of the interest that had accrued on the loans on the date of the exercise of the Conversion Option "regardless of whether such loans and interest have been repaid or remain outstanding."[56]

9.      Article VIII of the Amended Operating Agreement governed the dissolution of ATF Services. It provided that ATF Services would be dissolved upon termination of the JVA and that upon dissolution, Debtor and OR Holding would each receive a copy of the Title Plant and related software, provided that all obligations of ATF Services to OR Holding were satisfied before any obligations of ATF Services to Debtor were satisfied.[57]

10.     In other words, Debtor's right to receive a copy of the Title Plant under the Amended JVA and Amended Operating Agreement was conditioned on

(a)      the dissolution of ATF Services by an event requiring dissolution under the Florida Limited Liability Company Act or the termination of the Amended JVA *and* the payment of all debts owed by ATF Services to OR Holding; or

(b)     Debtor's exercise of its Put Option upon the conditions set forth in the Amended JVA or OR Holding's exercise of its Call Option.

**F.      The Master Agreement**

1.      After entering into the JVA and the Amended JVA, Debtor continued to service its existing title insurance policies and to manage its policy-related claims. To maintain its insurance license, Debtor was required by Florida law to maintain a surplus calculated at 10% of the value of its assets over the amount of its liabilities.[58]

2.      Beginning in late 2014, the value of Debtor's surplus declined.[59]

---

[56] Doc. No. 427, Defendants' Ex. 26, Article VI, § 3.
[57] Doc. No. 427, Defendants' Ex. 26, Article VIII, §§ 1, 3.
[58] Fla. Stat. § 624.408.
[59] Doc. No. 360, ¶ 74.

3.     In 2015, Debtor's President, John Simmons, contacted OR Title and requested that OR Title make a proposal to reinsure all of Debtor's title policy exposure.[60] OR Title authorized Debtor to seek similar arrangements with other insurance companies.

4.     The OR Defendants were aware that a transfer of Debtor's assets in connection with OR Title's agreement to reinsure Debtor's title policy liabilities could be open to attack as a fraudulent transfer. For example, OR Title's attorney's notes from an October 2015 meeting recommend that certain transactions be completed before Debtor is insolvent and state that "Ted [Conner] knows that OR will get sued."[61]

5.     On October 1, 2015, SOBC Corp. ("SOBC") offered to purchase 100% of Debtor's stock in exchange for the payment of $1.00 and $100,000.00 to cover Debtor's expenses in documenting the transaction.[62]

6.     By the fall of 2015, the value of Debtor's surplus was nearing zero.[63]

7.     As of December 2015, Debtor had not given OR Holding notice of intent to terminate the Amended JVA in advance of the Amended JVA's initial term or any renewal term; Debtor and OR Holding had not terminated the Amended JVA by mutual agreement; Debtor had not exercised its Put Option; OR Holding had not exercised its Call Option; and ATF Services had not been dissolved under Florida law or the Amended Operating Agreement.

8.     As of December 2015, OR Holding had advanced over $40 million to ATF Services under its loan agreements in order to cover ATF Services' reported losses.[64] In addition, in his Answers to Contention Interrogatories, Plaintiff does not contend that in December 2015, Debtor

---

[60] Doc. No. 360, ¶ 77.
[61] Doc. No. 435-1, Plaintiff's Ex. 390; Doc. No. 462-9, Plaintiff's Ex. 408.
[62] Doc. No. 360, ¶ 81; Doc. No. 457, Defendants' Ex. 158.
[63] Doc. No. 360, ¶ 82.
[64] Doc. No. 464, February 16 Trial Transcript, pp. 156-157.

could have raised the equity capital necessary to satisfy any of the financial requirements to terminate the Amended JVA, dissolve ATF Services, or exercise its Put Option.[65]

9.    On December 1, 2015, the Florida OIR notified Debtor that it would refer Debtor to the Florida Department of Financial Services ("DFS") for DFS to commence a state court receivership proceeding against Debtor.[66] In order to avoid a receivership proceeding, Debtor, OR Holding, and OR Title discussed entering into a proposed "master agreement."[67]

10.    OR Title's CFO, Gary Horn,[68] testified at trial regarding notes he prepared for a presentation of the proposed master agreement to OR Title's board of directors.[69] His notes include the following:

> Why are we doing this:  Our [ATF Services] operation is nicely profitable for us - it's working exactly as intended [*note:  this is despite ATF Services' reported losses*]. By doing the deal, we're avoiding any potential negative impact that a receivership might have on our business. Also, ATIF has certain ongoing rights to the title plant and certain other assets that we want to keep out of our competitors (sic) hands. The deal eliminates all of those ongoing rights - so it really strengthens our hand.[70]

11.    On December 12, 2015, Debtor, ATIF Trust, OR Holding, OR Title, and ATF Services entered into a master agreement (the "Master Agreement").[71] The Master Agreement states that OR Title was willing to reinsure Debtor's title policies under the terms of the attached Title Insurance Reinsurance Assumption Contract (the "Reinsurance Contract"),[72] in exchange for Debtor and ATIF Trust's transfer of certain assets to OR Title.

---

[65] Doc. No. 432, Defendants' Ex. 417.
[66] Doc. No. 360, ¶ 90.
[67] Doc. No. 360, ¶¶ 92-98.
[68] Doc. No. 360, ¶ 18; Doc. No. 466, February 18 Trial Transcript, p. 36.
[69] Doc. No. 466, February 18 Trial Transcript, pp. 12-18.
[70] Doc. No. 435-8, Plaintiff's Ex. 39 (italicized note added).
[71] Doc. No. 435-4, Plaintiff's Ex. 501, pp. 1-14.
[72] Doc. No. 435-4, Plaintiff's Ex. 501, pp. 15-25.

12.     Under the Master Agreement, Debtor agreed to transfer the following assets to OR Title:

(a)     all of Debtor's cash and cash equivalents, except $1.5 million in cash and other limited cash assets;

(b)     all of Debtor's rights in intellectual property, as defined in the attached Intellectual Property Assignment (the "IP Assignment"); and

(c)     the Headquarters Property and an adjacent vacant parcel of land.[73]

13.     Under the IP Assignment, Debtor and ATIF Trust agreed to transfer to OR Title a list of intellectual property, including the Marks, together with the Title Plant "and all software, data, documentation relating thereto and all copies thereof."[74]

14.     The Florida OIR approved the Master Agreement.[75]

15.     Thereafter, the transfers provided for in the Master Agreement were effectuated. Debtor's President, Mr. Simmons, caused Debtor to deliver to OR Title the A and B Tapes of the Title Plant that had been in Debtor's possession.[76]

16.     After Debtor executed the transfers provided for in the Master Agreement, its remaining assets consisted of $1,500,000.00; Debtor retained its liabilities that were not related to title policy claims.[77]

## II.     THE BANKRUPTCY CASE AND THE ADVERSARY PROCEEDING

In March 2017, less than 14 months after transferring nearly all its assets to OR Title, Debtor retained Gerard McHale as its Chief Restructuring Officer. On March 2, 2017, Mr. McHale, in his

---

[73] Doc. No. 435-4, Plaintiff's Ex. 501, §§ 1(a), (c).
[74] Doc. No. 435-4, Plaintiff's Ex. 501, pp. 37-43.
[75] Doc. No. 360, ¶ 100.
[76] Doc. No. 464, February 16 Trial Transcript, pp. 151-152, 158.
[77] Doc. No. 435-4, Plaintiff's Ex. 501, § 1(a)(i); Doc. No. 370, ¶ 131.

capacity as Chief Restructuring Officer caused Debtor to file a Chapter 11 petition.[78] The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors.[79]

On July 5, 2018, the Court entered an *Order Confirming Second Amended Chapter 11 Plan Filed by Official Committee of Unsecured Creditors*, and Plaintiff was appointed as the Creditor Trustee.[80]

On October 16, 2018, Plaintiff, in his capacity as Creditor Trustee, commenced this adversary proceeding, and on February 26, 2020, Plaintiff filed the *Corrected Third Amended Adversary Complaint* (the "Complaint").[81]

In the Complaint, Plaintiff generally alleges that under the Master Agreement, OR Title assumed Debtor's title policy claims liability in exchange for Debtor's cash and investments, intellectual property, and real estate, but that OR Title "paid nothing" for the intellectual property and the real estate.[82] The Complaint contains twelve counts:  Counts I through IV are actions against OR Title to recover actual and constructive fraudulent transfers under 11 U.S.C. § 548;[83] Counts V through VIII are actions against OR Title to recover actual and constructive fraudulent transfers under Fla. Stat. §§ 726.105 and 726.106; Count IX is an action for a declaratory judgment that ATF Services is the alter ego of OR Holding and OR Companies; and Counts X through XII are actions for successor liability against OR Holding and OR Companies.[84]

---

[78] Main Case, Doc. No. 1.

[79] Main Case, Doc. Nos. 51, 67.

[80] Main Case, Doc. No. 338.

[81] Doc. No. 162.

[82] Doc. No. 162, ¶¶ 49-62.

[83] Unless otherwise stated, statutory references are to the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

[84] Doc. No. 162, ¶¶ 86-155. "OR Companies" is defined in the Complaint as Old Republic Title Companies, Inc., a Delaware corporation created in 2016 as an "intermediary holding company" between OR Holding and ATF Services (Doc. No. 162, ¶ 10).

During trial, Plaintiff filed a *Motion to Amend the Complaint to Conform to Evidence* (the "Motion") in order to include a claim for the avoidance of Debtor's 2011 transfer of its trade and service marks to ATIF Trust.[85] Plaintiff filed the Motion under Fed. R. Civ. P. 15(b). Rule 15(b) provides that the Court "should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits."[86] The OR Defendants filed a response and objection to the Motion.[87]

## III.    PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS

Plaintiff's fraudulent transfer claims are brought under § 548 and Chapter 726 of the Florida Statutes. Under § 548, transfers may be avoided if they were made within two years of the filing of the bankruptcy petition. Actions under Chapter 726 must be filed within four years after the transfer was made.[88] A trustee's state law fraudulent transfer claims are analogous in form and substance to fraudulent transfer claims under § 548 and may be analyzed contemporaneously. "The only material difference between the state and bankruptcy provisions is the favorable four-year look-back period under the Florida law."[89]

Under § 548(a)(1)(A), a trustee may avoid a transfer of a debtor's property if the debtor made the transfer with actual intent to hinder, delay, or defraud a creditor.[90] Under Fla. Stat. § 726.105(1)(a), a transfer made by a debtor is actually fraudulent as to a creditor if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor."[91] In determining whether a debtor made a transfer with actual fraudulent intent, courts generally look to

---

[85] Doc. No. 442.
[86] Fed. R. Civ. P. 15(b)(1), as made applicable in this proceeding by Fed. R. Bankr. P. 7015.
[87] Doc. No. 446.
[88] Fla. Stat. § 726.110.
[89] *In re Pearlman*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014)(citations omitted).
[90] 11 U.S.C. § 548(a)(1)(A).
[91] Fla. Stat. § 726.105(1)(a).

"badges of fraud," such as (1) whether the transfer was made to an insider, (2) whether the debtor retained possession or control of the property after the transfer, (3) whether the transfer occurred shortly after a substantial debt was incurred, and (4) whether the value received by the debtor for the transfer was reasonably equivalent to the value of the asset transferred.[92]

Under § 548(a)(1)(B), a trustee may avoid any transfer of a debtor's property if the debtor received less than reasonably equivalent value for the transfer and was insolvent or became insolvent as a result of the transfer.[93] Under Fla. Stat. § 726.105(1)(b), a transfer is constructively fraudulent as to present and future creditors if the debtor made the transfer "without receiving a reasonably equivalent value in exchange," and the debtor was engaged in a business for which its remaining assets were unreasonably small or reasonably believed that it would incur debts beyond its ability to pay.[94] Under § 726.106, a transfer is constructively fraudulent as to present creditors if the debtor made the transfer "without receiving a reasonably equivalent value in exchange" and the debtor was insolvent or became insolvent as a result of the transfer.[95]

The trustee bears the burden of proof on each of the elements of an actually or constructively fraudulent transfer claim by a preponderance of the evidence.[96] For example, in order to avoid a transfer as constructively fraudulent, a trustee must prove that the debtor did not receive reasonably equivalent value in exchange for the transfer; likewise, if a trustee asserts "lack of reasonably equivalent value" as a badge of fraud evidencing an actually fraudulent transfer, the trustee bears the burden of proof on that issue.[97]

---

[92] *United States v. Winland*, 2017 WL 6498074, at *5 (M.D. Fla. Dec. 1, 2017)(citing Fla. Stat. § 726.105(2)).
[93] 11 U.S.C. § 548(a)(1)(B).
[94] Fla. Stat. § 726.105(1)(b).
[95] Fla. Stat. § 726.106(1).
[96] *See In re Universal Health Care Group, Inc*., 560 B.R. 594, 601 n. 17 (Bankr. M.D. Fla. 2016); and *In re American Way Service Corporation*, 229 B.R. 496, 525-26 (Bankr. S.D. Fla. 1999).
[97] *In re Kane & Kane*, 479 B.R. 617, 628 (Bankr. S.D. Fla. 2012).

## IV.    REASONABLY EQUIVALENT VALUE

The linchpin of Plaintiff's claims is his contention that Debtor received less than reasonably equivalent value in exchange for the transfer of its assets under the Master Agreement. Because neither the Bankruptcy Code nor Florida law defines the term "reasonably equivalent value," courts generally consider factors such as the "good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length."[98] But "the essential examination is a comparison of 'what went out' with 'what was received.'"[99]

Plaintiff contends that the value of the assets that Debtor gave up under the Master Agreement exceeded the value that it received by $59 million.[100] The OR Defendants contend that Debtor's transfer of assets under the Master Agreement constituted "an even exchange" of value.[101]

### A.    The Consideration Received by Debtor Under the Master Agreement

The parties agree that the value that Debtor received under the Master Agreement is measured by the amount of Debtor's title policy liabilities that were assumed by OR Title under the Reinsurance Contract.[102]

Plaintiff asserts that based on OR Title's own valuation of the assumed liabilities on the date of the Master Agreement, OR Title assumed liabilities in the amount of $46.2 million. The notes that OR Title's CFO, Gary Horn, testified he prepared in advance of his presentation to OR Title's Board regarding the proposed Master Agreement state that OR Title's "claims people have done extensive

---

[98] *In re Universal Health Care Group, Inc.*, 560 B.R. at 602(citation omitted).
[99] *United States v. Winland*, 2017 WL 6498074, at *5(quoting *In re Leneve*, 341 B.R. 53, 57 (Bankr. S.D. Fla. 2006)).
[100] Doc. No. 466, February 18 Trial Transcript, pp. 159-160; Doc. No. 469, February 23 Trial Transcript, p. 41.
[101] Doc. No. 469, February 23 Trial Transcript, pp. 51-52.
[102] Doc. No. 435-4, Plaintiff's Ex. 501, pp. 15-25.

due diligence on [Debtor's] existing claims" and "run actuarial models to get comfortable with the future exposure," and determined that OR Title would assume $48 million in claims exposure under the Reinsurance Contract.[103]

In addition, Mr. Horn testified with respect to a document titled *ATIF Assumed Reinsurance Contract Summary December 12, 2015*[104] that was created after the Master Agreement (the "Reinsurance Contract Summary").[105] The Reinsurance Contract Summary notes that Debtor had ceased issuing new title policies in 2009[106] and states that the "liabilities assumed consist primarily of insurance reserves (case basis reserves, SPR/IBNR, and unallocated loss adjustment expenses)."[107] A section of the Reinsurance Contract Summary titled "Valuation" states that the balance of the "case basis claims" was $14.836 million, and that the value of the "IBNR and ULAE" was $31.3 million.[108] Together, the $14.836 million and the $31.3 million total $46,136,000.00, which approximates Plaintiff's assertion of the value of the title insurance liabilities assumed.

However, the OR Defendants assert that the value of the assumed title policy liabilities was at least $57.2 million. The OR Defendants' expert witness, Lauren Cavanaugh, an actuary in the insurance industry, testified at trial that she had conducted an actuarial analysis of the reinsurance transaction between Debtor and OR Title.[109] Ms. Cavanagh opined that under the Master Agreement and Reinsurance Contract, OR Title assumed liabilities ranging from $45 million to approximately $57.2 million, and that it would also be reasonable for OR Title to have charged an additional amount

---

[103] Doc. No. 435-8, Plaintiff's Ex. 39.
[104] Doc. No. 462-2, Plaintiff's Ex. 34.
[105] Doc. No. 466, February 18 Trial Transcript, p. 30.
[106] Doc. No. 462-2, Plaintiff's Ex. 34, p. 3.
[107] Doc. No. 462-2, Plaintiff's Ex. 34, p. 2.
[108] Doc. No. 462-2, Plaintiff's Ex. 34, p. 5.
[109] Doc. No. 468, February 22 Trial Transcript, pp. 138-142.

for risk and profit margins.[110] Ms. Cavanaugh testified that an "actuarial central estimate" of $50,889,000.00 was the market value for the reinsurance of Debtor's title policy liabilities.[111]

**B.    The Valuation of the Assets Transferred by Debtor Under the Master Agreement**

The assets that Debtor and ATIF Trust agreed to transfer to OR Title under the Master Agreement included tangible assets, such as Debtor's cash and cash equivalents and real estate, and intangible assets that included Debtor's intellectual property and the Title Plant.[112] As demonstrated below, whether Debtor received reasonably equivalent value for its transfers to OR Title under the Master Agreement hinges, in large part, on the value of Debtor's intangible assets.

**1.    The Value of Debtor's Tangible Assets**

The parties have stipulated that the value of "certain cash, cash equivalents, short term investments, bonds and accrued investment income" transferred by Debtor to OR Title was $30,361,074.00 as of December 12, 2015.[113] The parties have also stipulated that the value of the Headquarters Property and adjacent vacant land transferred by Debtor to OR Title was $17.21 million as of December 12, 2015.[114] Accordingly, the stipulated value of Debtor's tangible assets is $47,571,074.00.

**2.    The Value of Debtor's Intangible Assets**

Plaintiff contends that the intangible assets transferred by Debtor under the Master Agreement included the Title Plant. The threshold issue before the Court is whether in 2015, six years after the JVA, Debtor retained any rights to the Title Plant that it transferred under the Master Agreement. By

---

[110] Doc. No. 468, February 22 Trial Transcript, pp. 171-172.
[111] Doc. No. 468, February 22 Trial Transcript, p. 166.
[112] Doc. No. 435-4, Plaintiff's Ex. 501.
[113] Doc. No. 149.
[114] Doc. Nos. 137, 141.

agreement of the parties, Plaintiff and the OR Defendants presented their evidence on this issue on the first and second days of trial.[115]

The Court announced its ruling on this threshold issue on the second day of trial.[116] The Court had considered the parties' evidence and the provisions of the 2011 Amended JVA and the 2011 Amended Operating Agreement the conditions under which Debtor was entitled to receive a copy of the Title Plant. Under the 2011 Amended JVA, Debtor was entitled to a useable and working copy of the Title Plant "upon the dissolution or liquidation of [ATF Services], or upon exercise of a put or call."[117] And under the 2011 Amended Operating Agreement, Debtor was entitled to receive a copy of the Title Plant upon the dissolution of ATF Services, provided that all obligations owed by ATF Services to OR Holding had first been satisfied.[118] As of December 2015, the Amended JVA had not been terminated, ATF Services had not been dissolved, and the "evidence is that in December 2015, ATF Services owed OR Holding approximately $42 million,"[119] an obligation that ATF Services was required to repay before Debtor could receive a copy of the Title Plant.[120]

The Court concluded that although Debtor only held a right to receive a copy of the Title Plant upon the occurrence of certain conditions that had not occurred, Debtor had "rights or an interest in the Title Plant that the Debtor transferred to OR Title under the 2015 Master Agreement" and that [w]hether Plaintiff could recover against the OR Defendants depended upon the value of the assets that [Debtor] transferred, including the value of Title Plant."[121]

---

[115] Doc. No. 464, February 16 Trial Transcript, and Doc. No. 465, February 17 Trial Transcript.
[116] Doc. No. 465, February 17 Trial Transcript, at p. 80.
[117] Doc. No. 427, Defendants' Ex. 26, Amended JVA, § 18a.
[118] Doc. No. 465, February 17 Trial Transcript, pp. 82-83; Doc. No. 427, Defendants' Ex. 26, pp. 82-103, Amended Operating Agreement, attached as Exhibit F to the Amended JVA, Article VIII, §§1, 3.
[119] Doc. No. 465, February 17 Trial Transcript, p. 83.
[120] Doc. No. 464, February 16 Trial Transcript, pp. 156-157.
[121] Doc. No. 465, February 17 Trial Transcript, p. 84.

a.        **Plaintiff's Expert Testimony on the Value of Debtor's Intangible Assets**

Plaintiff's valuation expert, Allen Pfeiffer, holds a master's degree in Business Administration from Columbia Business School and is currently a managing director at Duff & Phelps, as well as that firm's global leader of complex valuation and bankruptcy litigation.[122] Mr. Pfeiffer opined that Debtor's intangible assets, consisting of the Title Plant, the trade name "The Fund," its workforce, patents, software, technology, know-how, and "those types of assets [that] are not on the balance sheet,"[123] were valued as of December 2015 at $80 million.[124]

At trial, Mr. Pfeiffer testified that of the three approaches to valuation (the "market approach," the "replacement cost approach," and the "discounted cash flow approach"), he used the market approach to value Debtor's intellectual property and the replacement cost approach to value the Title Plant.[125]

Mr. Pfeiffer testified that to determine the market value of Debtor's total intangible assets, he used a multiple based on a "premium over tangible equity."[126] Mr. Pfeiffer testified that his first step was to determine "comparable companies" in the title insurance industry.[127] He determined that Stewart Title, a title insurance company that is much larger than Debtor, and ITIC, a much smaller title insurance company, were companies that were comparable to Debtor.[128]

Next, Mr. Pfeiffer determined the total enterprise value of Stewart Title and ITIC by multiplying the number of their outstanding shares by their publicly traded share prices and then adding the companies' outstanding debt; Mr. Pfeiffer then subtracted the tangible equity—the

---

[122] Doc. No. 466, February 18 Trial Transcript, pp. 107, 110.
[123] Doc. No. 466, February 18 Trial Transcript, pp. 142, 158.
[124] Doc. No. 466, February 18 Trial Transcript, p. 149.
[125] Doc. No. 466, February 18 Trial Transcript, pp. 121-122.
[126] Doc. No. 466, February 18 Trial Transcript, pp. 144-145; Doc. No. 467, February 19 Trial Transcript, p. 30.
[127] Doc. No. 466, February 18 Trial Transcript, pp. 125-126.
[128] Doc. No. 466, February 18 Trial Transcript, pp. 138, 144-145.

companies' balance sheet values for their tangible assets "like cash, receivables, inventory, equipment and the like"—leaving him with the value of the intangible assets such as patents, software, work force, and know-how, that are not reflected on a company's balance sheet.[129] Mr. Pfeiffer described the process as this:

> So, here we look at ITIC as the first example, and we see that ITIC market cap, which is not a debatable number. That's their publicly traded market cap. It's $171 million.
>
> If you look at their balance for ITIC, you would see their tangible book equity is $138 million. Those are tangible assets. And you take that premium over tangible equity in the second column, it's $33 million. That means the difference between their market cap and their tangible value is their intangible value. Their intangible value is $33 million. That's their premium over tangible equity, otherwise known as intangible value.
>
> I took that $33 million and I divided by my revenue, $125 million of revenue -- that's how much revenue ITIC had in the twelve months prior to our valuation date -- and I derived a multiple of 33 divided by 125, which is .26. That's the multiple. Which means for every dollar of revenue ITIC has, they're generating public market cap value of 26 cents per dollar of intangible value for -- again, for the title insurance industry, and ITIC is in that same industry.[130]

After arriving at ITIC's multiple of .26, Mr. Pfeiffer performed the same calculation for Stewart Title, a larger company, and arrived at a multiple of .28.[131]

Next, Mr. Pfeiffer estimated Debtor's approximate income in 2015 by multiplying the total title insurance premiums earned by title insurers in the State of Florida by Debtor's historical average share of the premiums earned by Debtor and OR Title, 71.6%, and arrived at $283 million. To the $283 million, Mr. Pfeiffer added ATF Services' 2015 income of $24 million to arrive at Debtor's "expected" total estimated income in 2015 of $308 million. Mr. Pfeiffer then multiplied the $308

---

[129] Doc. No. 466, February 18 Trial Transcript, pp. 141-142.
[130] Doc. No. 466, February 18 Trial Transcript, pp. 144-145.
[131] Doc. No. 466, February 18 Trial Transcript, pp. 145-146.

million by his previously determined multiple of .28 and arrived at $80 million of value for Debtor's intangible property.[132]

Mr. Pfeiffer then used the replacement cost approach to determine the value in 2015 of the Title Plant that Debtor had transferred to ATF Services in 2009 under the JVA.[133] To start, Mr. Pfeiffer relied on two prior appraisals of the Title Plant: a 2004 valuation performed by Regulatory Research Corporation ("RRC") that valued the Title Plant at $60,160,534 for regulatory purposes,[134] and a 2009 valuation performed by D. Bello and Associates at OR Title's request that valued the Title Plant at $10.7 million.[135] Mr. Pfeiffer testified:

> So I have an RRC valuation done which, after adjusting it for passage of time, I concluded on a $46.7 million valuation. And based on D. Bello, after adjusting it for the passage of time, I concluded on $27.9 [million].
>
> Although the average between 46.7 and 27.9 is significantly higher than 30, I arrived on a conservative basis on a valuation of $30 million, which is slightly higher than the D. Bello conclusion but significantly lower than the RRC conclusion.[136]

Mr. Pfeiffer testified that his $30 million valuation of the Title Plant is a component of his $80 million valuation of all of Debtor's intangible assets. He also testified that "the $80 million valuation doesn't change if the $30 million goes down to 20 [million], then the rest of the intangibles are worth 60 [million]."[137]

On cross-examination, Mr. Pfeiffer admitted that he does not hold any certifications or designations as an appraiser or a valuation expert and that, although he once valued a title company

---

[132] Doc. No. 466, February 18 Trial Transcript, pp. 147-149.
[133] Doc. No. 466, February 18 Trial Transcript, pp. 121-122.
[134] Doc. No. 441, Deposition Transcript of Nelson Lipshutz, corporate representative of RRC, p. 32; Doc. No. 466, February 18 Trial Transcript, pp. 152-153.
[135] Doc. No. 440, Deposition Transcript of Jeffrey Bates, corporate representative of D. Bello and Associates, pp. 64-65; Doc. No. 466, February 18 Trial Transcript, pp. 150-155.
[136] Doc. No. 466, February 18 Trial Transcript, p. 158.
[137] Doc. No. 466, February 18 Trial Transcript, p. 158.

with a title plant component, he has never separately valued a title plant.[138] Mr. Pfeiffer also acknowledged that his written expert report did not identify any textbooks or valuation organizations that use the multiple "premium over tangible equity" that he used in his valuation of Debtor's intangible assets.[139] Finally, Mr. Pfeiffer acknowledged that his written expert report did not identify a single textbook that he relied on, testifying instead that "I don't rely on textbooks, I rely on doing valuations the way I always I do it."[140] In sum, Mr. Pfeiffer did not testify or otherwise provide the Court with any information regarding reliable principles, methods, and evaluation standards used in appraising intangible assets or title plants.

**b.** **Defendants' Expert Testimony on the Value of Debtor's Intangible Assets**

The OR Defendants' valuation expert, Steven J. Hazel, is a Certified Public Accountant and holds valuation credentials as Accredited Senior Appraiser, Accredited in Business Evaluation, and Certified Valuation Analyst.[141] Mr. Hazel disputed Mr. Pfeiffer's valuation methodology.

Mr. Hazel testified that the "premium over tangible equity" multiple utilized by Mr. Pfeiffer is not an accepted multiple in the valuation community.[142] However, like Mr. Pfeiffer, Mr. Hazel did not testify or provide the Court with any information regarding reliable principles, methods, and evaluation standards used in appraising intangible assets or title plants.

Mr. Hazel testified that Mr. Pfeiffer's valuation of Debtor's 2015 revenues was based on the following flawed assumptions: (1) that a transferee of the intangible assets would produce $308 million in revenue on acquisition date, with no period to "ramp up" its operations; (2) that 71.6% of OR Title's revenues would shift to a transferee of Debtor's intangible assets; (3) that all of ATF

---

[138] Doc. No. 466, February 18 Trial Transcript, p. 166.
[139] Doc. No. 467, February 19 Trial Transcript, pp. 30-31.
[140] Doc. No. 467, February 19 Trial Transcript, p. 32.
[141] Doc. No. 468, February 22 Trial Transcript, pp. 12-13.
[142] Doc. No. 468, February 22 Trial Transcript, p. 23.

Service's workforce and all of OR Title's attorney-agents, notwithstanding their relationship with ATF Services and OR Title since 2009, would commence employment with a transferee of Debtor's intangible assets; and (4) that a transferee of the intangible assets would have the working capital necessary to operate the business.[143]

Mr. Hazel testified that each of the intangibles should have been valued separately, and that specific methodologies exist to value a trade name such as "The Fund" and assets such as a workforce in place.[144] Mr. Hazel also opined that the cost of employees, attorney-agents, and working capital to develop infrastructure would outweigh any value that a transferee received from the intangible assets.[145] Consequently, Mr. Hazel concluded that there was no value to Debtor's intangible assets; the value of "the broad intangible assets, again, because the costs and all the risk outweighs any potential value, even at the extreme numbers that Mr. Pfeiffer came up with, is still negative."[146]

With respect to the Title Plant, Mr. Hazel testified that Mr. Pfeiffer's valuation failed to properly account for four overlapping types of obsolescence. These types of obsolescence are (1) "technological obsolescence" due to the extensive changes in technology since the 2004 and 2009 appraisals (for example, in 2004, real property records were commonly stored on microfilm or flat film, a storage technology that was longer used in 2015);[147] (2) "physical obsolescence" because the Title Plant's computer hardware is no longer supported or has become difficult to maintain;[148] (3) "functional obsolescence" because, starting in 2015, Clerks of Court were required by Florida law to maintain free, public, online, searchable databases of real property records;[149] and (4) "economic

---

[143] Doc. No. 468, February 22 Trial Transcript, pp. 25-35.
[144] Doc. No. 468, February 22 Trial Transcript, pp. 35-36.
[145] Doc. No. 468, February 22 Trial Transcript, pp. 29-30, 35.
[146] Doc. No. 468, February 22 Trial Transcript, p. 36.
[147] Doc. No. 468, February 22 Trial Transcript, pp. 40, 45.
[148] Doc. No. 468, February 22 Trial Transcript, pp. 47-48.
[149] Doc. No. 468, February 22 Trial Transcript, pp. 41, 48.

obsolescence" due to the lower costs of conducting real property searches online as compared to the cost of maintaining a title plant.[150]

In addition, Mr. Hazel testified that Mr. Pfeiffer did not properly consider the cost to maintain and modernize the Title Plant,[151] and that Mr. Pfeiffer had utilized a broad consumer price index to adjust for inflation between 2009 and 2015 rather than a technology-specific Consumer Price Index, which resulted in the increase in the Title Plant's value by $16 million.[152] Based on his analysis of the Title Plant under the cost approach, the market approach, and the income approach, Mr. Hazel concluded that the value of the Title Plant was *de minimis* or, in a relative range of valuation, up to a maximum of $1.1 million.[153]

### 3. Plaintiff did not meet his burden of proof.

After carefully considering the testimony and evidence presented at trial, the Court finds that Plaintiff did not meet his burden of proof to establish that Debtor received less than reasonably equivalent in exchange for the assets that Debtor transferred to OR Title under the 2015 Master Agreement.

First, although Plaintiff's expert, Mr. Pfeiffer, has years of experience in the valuation field and appears to have the "specialized knowledge" that would help the Court "to understand the evidence or to determine a fact in issue" (as required by Rule 702(a) of the Federal Rules of Evidence), Mr. Pfeiffer did not establish that his testimony "is the product of reliable principles and methods" as required by Evidence Rule 702(c).[154] Mr. Pfeiffer admitted that his expert report did not refer to any textbooks or treatises, and he testified that, "I don't rely on textbooks, I rely on doing valuations the

---

[150] Doc. No. 468, February 22 Trial Transcript, p. 48.
[151] Doc. No. 468, February 22 Trial Transcript, pp. 50-51.
[152] Doc. No. 468, February 22 Trial Transcript, pp. 52-53.
[153] Doc. No. 468, February 22 Trial Transcript, pp. 20, 56-57.
[154] Fed. R. Evid. 702.

way I always I do it."[155] In other words, Mr. Pfeiffer's opinions are largely *ipse dixit*: the intangible assets have the values stated because he said so.[156]

Second, Mr. Pfeiffer testified that his $80 million valuation of Debtor's intangible assets included "The Fund" trade name and Debtor's workforce, know-how, patents, software, and technology,[157] with no breakdown of the individual intangible assets. Mr. Pfeiffer's total valuation specifically included Debtor's workforce, know-how, and network of attorney-agents. But after the 2009 JVA, the vast majority of Debtor's employees and a number of Debtor's senior management team were employed by ATF Services and most of Debtor's attorney-agents had signed agency agreements with OR Title.[158] In other words, Debtor transferred its workforce, know-how, and network of attorney-agents to ATF Services and OR Title in 2009, so that when Debtor entered into the 2015 Master Agreement, it no longer had these intangible assets to transfer. And because Mr. Pfeiffer did not value these intangible assets separately, the Court cannot determine what portion of his $80 million valuation is attributable to them.

Third, even if the Court were to accept Mr. Pfeiffer's valuation of the Title Plant, Plaintiff failed to present evidence of the value of Debtor's *rights or interest* in the Title Plant as of 2015. Plaintiff presented no evidence on the value of Debtor's contingent interest in the Title Plant as of December 2015, how the value of the Title Plant should be discounted to account for the contingent nature of Debtor's interest, or whether the value of Debtor's interest in the Title Plant would be affected by OR Title's right to a copy of the Title Plant.

---

[155] Doc. No. 467, February 19 Trial Transcript, p. 32.

[156] *In re ICMfg & Associates, Inc.*, 602 B.R. 780, 786 (Bankr. M.D. Fla. 2018)(citing Black's Law Dictionary 833 (7th ed. 1999) for explaining that the term is referred to as "[s]omething asserted but not proved;" and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) for the holding that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

[157] Doc. No. 466, February 18 Trial Transcript, pp. 142, 158.

[158] Doc. No. 360, ¶¶ 32, 38-53; Doc. No. 370, ¶¶ 122-123.

Fourth, Debtor had transferred the Marks, including "The Fund" trade name, to ATIF Trust (the "Initial Transfer") in June 2011, four years before the Master Agreement.[159] Under the 2015 Master Agreement and related IP Assignment, it was ATIF Trust—not Debtor—that transferred the Marks to OR Title.[160] In order to avoid the transfer of the Marks to OR Title, Plaintiff acknowledges in his *Motion to Amend the Complaint to Conform to Evidence*[161] that he must first avoid the Initial Transfer. Plaintiff contends that the Initial Transfer is voidable because it was to an insider, was for no consideration, and was hidden from creditors.[162] Citing the bankruptcy court's ruling in *In re Kipnis*,[163] Plaintiff also contends that he may step into the shoes of the Federal Deposit Insurance Corporation, a creditor in this case, and use the FDIC's six-year statute of limitations for commencing a fraudulent transfer action.[164]

However, the OR Defendants contend that Plaintiff's attempt to avoid the Initial Transfer is futile because (1) the claim is time-barred under both the two-year limitations period of § 548 and the four-year limitations period of Florida Statute § 726.110, (2) Plaintiff stipulated that Debtor was solvent in 2011, and (3) the transfer was disclosed in the public records.[165]

The Court need not decide this issue because, even if Plaintiff were successful in avoiding the Initial Transfer of the Marks, he has provided no evidence of their value at the time of the 2015 Master Agreement. For example, Plaintiff presented no evidence regarding whether the value of the Marks was affected by ATF Services' use of "The Fund" trade name since 2009, a date well outside any applicable look-back period.

---

[159] Doc. No. 370, ¶ 129.
[160] Doc. No. 370, ¶ 130.
[161] Doc. No. 442.
[162] Doc. No. 442; Doc. No. 469, February 23 Trial Transcript, pp. 14-18.
[163] *In re Kipnis*, 555 B.R. 877, 883 (Bankr. S.D. Fla. 2016).
[164] Doc. No. 442, p. 9, n. 5.
[165] Doc. No. 446; Doc. No. 469, February 23 Trial Transcript, pp. 42-49.

## V.    CONCLUSION

Viewing the transactions between Debtor, ATIF Trust, OR Holding, ATF Services, and OR Title in their entirety, there is little doubt that between 2009 and 2015, Debtor's title insurance business was transferred to OR Title. When Debtor entered into the 2009 JVA, it essentially transferred all of its business operations to OR Title and ATF Services, and only retained the business of "running off its claims tail."[166] In fact, Debtor expressly agreed in the JVA to take all reasonable actions to ensure that its title insurance business "will shift" to OR Title and that "all ancillary" business will be transferred to ATF Services.[167] In furtherance of the JVA, Debtor (1) transferred its Title Plant, workforce, management team, and know-how to ATF Services, and permitted ATF Services to use "The Fund" trade name, and (2) agreed in the JVA that it would no longer engage in the business of "title insurance underwriting or title insurance production"[168] and encouraged its attorney-agents to sign agency agreements with OR Title.

But Debtor's transfers in 2009 are beyond any look-back period for avoiding fraudulent transfers. By the time Debtor entered into the 2015 Master Agreement, Debtor's only remaining assets were its tangible assets, which Plaintiff has stipulated were worth $47,571,074.00, and its intangible assets consisting of its contingent right to obtain a copy of the Title Plant, and—if Plaintiff first succeeded in avoiding the Initial Transfer—the Marks, including the "The Fund" trade name.

The evidence before the Court is that under the 2015 Master Agreement, Debtor transferred tangible assets having a value of $47,571,074.00 in exchange for OR Title's assumption of Debtor's title insurance policy liabilities. These liabilities were contemporaneously valued by OR Title at $46,136,000.00, and retrospectively valued by the OR Defendants' expert witness as between $45

---

[166] Doc. No. 360, ¶ 36.
[167] Doc. No. 424, Defendants' Ex. 10, § 8a(iii).
[168] Doc. No. 424, Defendants' Ex. 10, § 8a(ii).

million and $57.2 million, with an "actuarial central estimate" of $50,889,000.00, without consideration of any additional risk premium or profit. Plaintiff has not presented admissible evidence of the value in 2015 of Debtor's intangible assets, such as its contingent right to obtain a copy of the Title Plant or the Marks.

In other words, the evidence shows only that Debtor transferred assets to OR Title valued at $47,571,074.00 in exchange for OR Title's assumption of title policy liabilities in the range of $45 million to $57.2 million. The Eleventh Circuit has held that "[t]he concept of reasonably equivalent value does not require a dollar-for-dollar transaction."[169] The Court concludes that Plaintiff has not met his burden of proof to establish that Debtor's transfers to OR Title under the 2015 Master Agreement were for less than reasonably equivalent value.

Clerk's Office to serve on interested parties via CM/ECF.

---

[169] *In re Northlake Foods, Inc.*, 715 F.3d 1251, 1257 (11th Cir. 2013), and *In re Northlake Foods, Inc.*, 518 F. App'x 604, 607 (11th Cir. 2013)(citing *In re Advanced Telecommunication Network, Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007)).